May it please the Court, Yakov Roth on behalf of the appellant Shen Zhen New World I. I'm hoping to reserve about four minutes for rebuttal. I'll watch the clock. Your Honor, the cross-cutting legal problem with the charges in this case is that the government's theory of the case is simply not a theory of bribery under federal law. In the Snyder decision from the Supreme Court last month, Justice Jackson defined a bribe as follows. She said, for a payment to constitute a bribe, there must be an upfront agreement to exchange the payment for taking an official action. Now their theme, repeated over and over, was that the chairman's approach was to give, give, give, until one day he has a big ask. They repeated over and over that these gifts that he was giving were a gamble or an investment in a relationship with the councilman that were intended to prime him and pave the way for a request that might follow in the future. Now that may violate state and local gift laws. It probably does. It may violate state and local ethics laws. But it simply is not bribery under federal law. So as I see it, most circuit courts disagree with you because there's a distinction that they draw between the intent, the necessary intent of a bribe taker versus a bribe giver. And so Snyder was a case about a public official taking a bribe, right? And so in that sense, there is a requirement that there be some kind of an agreement. But these other circuit courts, the D.C. Circuit, the Fourth Circuit, others, they have a different view, don't they? I don't think so, Your Honor, and I don't disagree with the way any of those courts have described it either. I think what's important is the giver needs to have the intent to enter into an agreement, an exchange, a quid pro quo. Right. It doesn't have to be accepted. So that's the point all these cases make and the government focuses on. It doesn't have to be an accepted agreement. So the giver has to have an act of offering or giving something of monetary, something of value, and that intent for a quid pro quo. But there doesn't need to be an agreement. That's right. And the public official, the taker, doesn't need to actually have acted on it. Right? It's complete at the moment something's given and there's that intent. Correct. It's complete at the moment of the giving so long as the giving is intended to effectuate the exchange. The quid pro quo. So why doesn't the evidence here add up to that? Because, Your Honor, again, I think the easiest way to see it is to look at the way the government described the case. Their theory was he's giving, giving, giving, and in the future he's going to make a request. That's very different from I'm giving and I expect in exchange that you will give me what I want and we're going to enter an agreement on that up front. That really wasn't their theory. So it's the key distinction here, as I see it, the key dichotomy between a gift on the one hand, goodwill gift on the one hand, and a bribe on the other, is are we talking about, this is what, I'll just use Professor Al-Shuler's description of the distinction, I think it's the best treatment of this issue in the Larview article that we cite, he distinguishes an actual or contemplated exchange of something of value for favorable governmental action, that's a bribe, versus a unilateral act intended to make favorable governmental action more likely. And the latter is a goodwill gift. And I think what the government was arguing here and what the government proved here was a classic goodwill gift, not a bribe. Well, it was just, you know, it was amazing to me when I read the briefs and some of the It wasn't just one visit, one little opportunity, it was multiple, many. That's right. It went on for years. And I think what's interesting is, and what's telling... I mean, why isn't that enough for the jury to say he was doing that with the intent that, you know, he was getting ready for the big ask? He's intending, he did all that with the intent to... He may have been giving it with the intent to make a big ask later, but that's different from giving it with the intent of effectuating an exchange now, as Judge Sanchez says. The bribe is either a bribe or not at the moment it's given. It doesn't retroactively become a bribe when three years later you say, I would really appreciate if you could support this project. I think you have to look at the intent when he made the gift. Correct. And he always intended to ask for the tower to be built sky high. You could make that inference, Your Honor, but that is not enough for purposes of bribery. That intent is not enough because that's... Why not? You're ascribing some sort of temporal element to the intent. If I'm giving a gift, but I'm intending for there to be a quid pro quo for an official act five years later, why isn't that a bribe? Because the parties need to agree at the time, or at least the intent needs to be to agree at the time that there will be an exchange because otherwise you're completely blurring the distinction. I thought we were clear. It's just the act of giving plus an intent. There doesn't need to be an agreement. Right. So if I'm the bribe giver and I give something over, but my specific intent is that I get an official act in return five years down the line, why isn't that a completed act of bribery? It depends. It's a little more nuanced than that, Your Honor. I think it depends. And again, going back to the way the professor described it, is this a unilateral act that is intended to make it more likely that I will get a good answer later when I make an ask? That's a goodwill gift. Maybe illegal, not under these statutes. Or am I giving it now intending to affect an exchange? So how much time needs to pass? Does it have to be a month from now when I want the official act in return? I don't think the timing is necessarily critical. But I do think the timing is sort of interesting here because the government admits in its brief, they say, oh, the chairman didn't even reveal what he wanted until years into this pattern of giving. So he's taking them out month after month. They're going to Las Vegas. They're having a good time. And that starts in 2013. It's not till 2016 that this issue of the redevelopment is posed to the councilmen. And in the interim is when Esparza, who's the government's key witness, Esparza's asked on the stand. Well, he says on the stand, he asked the chairman's aide, why are you doing this? Why is the chairman giving us all these trips? And that's when he's told, well, the chairman's approach is give, give, give, and then make a big ask. That just isn't a bribe under federal law, Your Honor. What about Esparza's testimony that when the big ask was made and they had, I guess, a cigarette break or something, that Huizar said, I'll be 100 percent behind it. I'll change zoning laws. I'll move it through the plum committee. Why isn't that evidence all along that Shenzhen had the specific intent to have that ask? That seems to be the key evidence on the government side. Your Honor, I don't know how that would distinguish any sort of typical lobbying scenario where the lobbyist may be taking the official out to dinner for golf for years and years, and then he says, oh, this bill's in front of you. Can I make a pitch? I'd like you to support the bill. The legislator says, yeah, I'm with you. It doesn't retroactively mean everything he did until then was a bribe. It needs to have been clear at the outset that you're effectuating an exchange. And I think it's one sort of telling contrast. If you look back at the original indictment, which included all the other Huizar schemes before there was a severance, it's really sort of incredible how much of a contrast there is. If you look at pages 3063 and 3064, for example, of the excerpts of record, there's allegations there that Esparza was telling aides to other developers, look, Huizar's not going to help you for free. Here's what you need to do. They haggle over the price. And that is a classic bribe. What we have here is not that, notwithstanding the fact that we had wiretaps. We had cooperating witnesses on both sides of the relationship. We have meticulous notes from Esparza that revealed these other bribes. Nothing like that in this case. Now, so all that was happening here was just lobbying? I think that... Just sort of getting to know you kind of thing? No, look, let's be honest. He didn't pick him out of the blue. The trips to Las Vegas, I mean, were just a little bit much. Your Honor, these, I certainly will agree that the scale is different from an ordinary lobbying relationship. It's quite a way of characterizing lobbying. But, Your Honor, we're also dealing with a billionaire. So you got to sort of, relatively speaking, it's not that much of a difference. I think what the record allows an inference of here is chairman was introduced to this person. He knew he was an important person for real estate. The chairman is buying real estate in the city. This is a good person to have on your side to get close to. And he spends the next three years getting close to him in the way that he does. And then he makes a request. If that's enough to draw the inference, then I think you are allowing that same sort of inference to be drawn in a more typical lobbying scenario, which is problematic. But look, if I haven't convinced Your Honors on the sufficiency point, I hope that at least this discussion has exposed that the line can be very blurry here between the gifts and the bribes. And that's why, in a case that presents this type of fact pattern, it's so critical to have a jury instruction that specifically talks about and gives some definition to this dichotomy. And I refer the court to the First Circuit's decision in Sawyer, which was a lobbying case. And the court vacated the convictions and said, where the difference between lawful and unlawful turns primarily on intent, and the lawful conduct is itself most unattractive, we think the jury needs to be told specifically that the defendant has not violated the bribery component of the travel act or committed honest services fraud if his intent was limited to the cultivation of business or political friendship. That's the goodwill gift instruction. We asked for a goodwill gift instruction. In this case, it was the proposal number 35, which would have explained that you do need to have the intent to enter an agreement, and ingratiation and access and sort of generalized influence is not enough. The district court refused to give this instruction, and the district court didn't give any other instruction on goodwill gifts. Now, again, I'm not saying you always need this instruction in every bribery case, but when the gifts themselves are undisputed, and the only question in the case really is about the intent between the gift and the bribe, and it is a blurry line, it's really important to have this sort of clarification. Now, the government says our instruction was full of errors. It's not. I urge the court to look at it in context. It's at ER 171 to 172. There is one sentence in this instruction that I will concede is debatable. There's a circuit split over the point. It's the sentence at the bottom of 171 that says the exchange must be clear and unambiguous. That is along the Second Circuit. They decided that this year in the Benjamin case. Some courts limit it to campaign contribution cases, so fine. But I'm not arguing about that sentence. Everything else in this instruction is legally correct. Well, you were asking for an instruction that the exchange for Huizar's agreement to take one or more specified official acts, and that's inconsistent with McDonald. This is why it's important to look at it, I think, in context. It says the government must prove beyond a reasonable doubt that the defendant specifically intended that any financial benefit that it may have provided the councilman Huizar was in exchange for his agreement to take one or more of the specified official acts. McDonald doesn't say that. Under McDonald, McDonald talks that the means that the bribe taker will use doesn't have to be specified in that agreement. If you're asking about the specified official acts part. I think that's erroneous. All I'll say about that is the specified official acts, that's supposed to be representing the government's theory because they identified a list of acts that were on the verdict sheet. So this is a reference to the acts that they said, this is about you were buying those acts. So this is not a legal, this is a sum up paragraph at the end of the instruction. It's not the legal point, it's the application to this case, and I think it's consistent with their theory. Did you, your time is sort of going down there. Yeah, yeah, I do want to talk about the evidence. Could you talk a little bit about the Travel Act and how that interacts with California? I can talk about the Travel Act. I'd really love to talk about the evidentiary errors because the Travel Act issue is limited to a few counts and the evidentiary errors cut across all the counts. I don't know if you want to just overlook the Travel Act. That's fine. I don't want to overlook. I just want to get the most mileage for my time. It's your call. I'm just curious. I'll try to come back to the Travel Act. I want to hit the evidence. All right, that's fine. Thank you, Your Honor. I appreciate the indulgence. For the reason we've discussed, we don't think the evidence was sufficient to cross the line. We think the jury didn't have proper instruction on where that line was. But even if you don't agree with that, I think all this discussion underscores how important it is to get the evidence right on the question of intent. And here, there was both an error in what came in and an error in what was kept out that I think tainted the jury's determination on intent. With respect to what came in, if what we're talking about is the chairman's intent, which, as Judge Sanchez has been pointing out, is the government's real theme, then why is the jury being told about other schemes, distinct schemes, that Huizar engaged in? It's two steps removed from any legitimate inference of culpability. If this had been a case against Huizar, he would have a 404B argument about that. But as to us, it's that plus guilt by association. We have case law that says that the district court can let in evidence that sort of sets the table or provides background and context. I mean, you know, you want to give the jury some understanding of how this thing is unfolding, right? Yeah, but, Your Honor, again, if we're charging... I mean, that's what the case law says. No, no, the case law says if it's inextricably intertwined, you need to get it in in order to tell a proper story, you can get it in. I don't know why that was true here, because the focus is on the chairman and the chairman's agents and what they did. There's no evidence they had any knowledge of anything that was happening distinct from this in the Huizar office. And yet, the way the government leads off at Star Witness is to talk about they had a modus operandi of pay to play, taking bribes, concealing it, all this stuff before they even get to what happened in this case. And so, of course, the jury then comes away from that with the understanding that, all right, well, he's done it with everyone else. So the ordinary inference is probably the same thing was happening here. But the district court struck a balance by not including any evidence of other corrupt developers. That's right. So it set the table and gave a general sense of how Huizar operates without getting into that other stuff. Why is that an abuse of discretion? I don't think it fixes the prejudice, because it's still you don't have the details of the other spokes. If you think of this as the rimless wheel, right, you don't have all the details about the other spokes. But the jury is being told there is this wheel and there are other spokes. And now we're going to talk about this one. So I think you've still come out of that. If you know the specifics or not, you come away from that with the starting premise of this is their way of doing business. And if everyone else did it, probably he did it too, which is the whole point of 404B is that you're not supposed to have that inference. And then last point, because it's very last, but it's very important on the evidence. I think this was exacerbated by the exclusion of the one piece of evidence that really did go directly to the chairman's intent in giving the gifts, which is when Ricky Zhang and other aides expressed concerns to him. Is this a good idea? Should we be taking this public official to Las Vegas all the time like this? And he brushed it off and said, what's the problem? I'm not worried. We're just having a good time. That's excluded. That is direct evidence of what he was thinking at the time. The district court thought it was hearsay. It's not hearsay because it's not being admitted for its truth. It doesn't matter if they were having a good time or not having a good time. The point was he didn't think he was doing anything wrong. It goes to intent. And under this Court's decision in Wagner, that's not inadmissible hearsay. So I think those two evidentiary issues warrant reversal. Yes. I think those two particularly combined warrant a new trial, at minimum, on this issue because they taint the jury's decision making on whether the necessary intent was there to take this across the line from the goodwill gift to the bribe. And I have two minutes left. So I'll try to reserve that. All right. Thank you, Your Honors. Good morning, Your Honors. And may it please the Court, Susan Haar on behalf of the United States. This Court should affirm the jury's convictions because all three substantive counts in this case required the jury to find a specific quid pro quo above and beyond what the law requires. And the jury rationally found that the defendant provided these benefits to Jose Huizar, intending at the time to influence him or in exchange for the official acts on a specific focus and concrete matter, which was the redevelopment of the L.A. Grand Hotel. Ms. Haar, can I ask, counsel posits that if the intent for an official act is maybe some distance in the future, it starts to seem more like lobbying and on the other side of what's more permissible. Can you address that point? Yes. There is a very clear line between what is ingratiation and what is quid pro quo bribery intent. That line is that when you are dealing with ingratiation or lobbying, there is no specific object in the provider's mind for the purpose of those gifts. It is just for building a reservoir of goodwill. The language that Sundiaman uses is that it's for generalized goodwill. It's for the mere tenure of the office. It is just for the status of that person as a public official. Once you have a specific object, as we did in this case, official acts for a specific matter, that is a specific quid pro quo intent. When did that happen here? The evidence in this case showed that that intent was formed from day one. There was compelling... So the first time that he offered a trip to Las Vegas with all the benefits of going to Las Vegas... Yes, Your Honor. That was with intent to effectuate a quid pro quo.  Exactly. The reason why is because there was extensive evidence that this chairman had a specific plan and intent to redevelop this property. Right, but did the evidence show he had knowledge that Ouizar was amenable to taking this bribe to help him do that tower? I don't know that there was specific evidence that he was clued into what Jose Ouizar was doing at the time of the very first trip, but that's not the standard. The standard is... I understand that, but you did admit a lot of evidence about the pay-to-place scheme within Ouizar's office, and that was to show what? Well, I would disagree with the characterization that a lot of evidence was admitted. There was not... Well, as far as... Okay, as far as it testified extensively about the scheme. If you read his testimony, you learn about the scheme. So that was admitted to show what? He explained the scheme because that's how it worked. When he would do things like coordinate with Ricky Zhang for the benefits, it's because that scheme required the middlemen to work together. When he would say that Wei Huang was the friend of the office, that witness couldn't explain what does that mean, the friend of the office? It means that the people who pay benefits to Jose Ouizar, they get access, they get their projects, they get the official acts. When Esparza testifies about the fact at length that with this defendant, there were extensive activities to conceal the benefits that were being provided through the structuring of this $600,000 sexual harassment loan. In order to explain what was the purpose of concealing... And Zhang understood that and that knowledge is attributable to... What's his name?  I mean, the owner, the sole owner of Shenzhen. Yes, it is. Ricky Zhang, we specifically argued and there was evidence to support that Ricky Zhang was an agent for this defendant. And frankly, even aside from that, Chairman Wei Huang, he was the direct driver of that settlement agreement and the way that it was structured. He is the one who had the connection to Grace Luck Holdings, which was the shell company. He was the one who hand selected Yan Yan, which was the employee that they passed off as an agent for the shell company, and to get the lawyer to try and use this fake shield of attorney-client privilege. And there was evidence that the redevelopment project was conceptualized from the very beginning? Yes, exactly. And that evidence was... This was the whole reason why he came to the United States. There was... It's undisputed. Even the defense witnesses said the same thing. This guy was a career developer. His portfolio is skyscrapers. And there was testimony from Ricky Zhang that when it was time for him to... He turned to him and said, it's time to invest in the United States. He handpicked this building by examining the blueprints to make sure that he could develop on it. And it was because he could do that that he came and purchased this property. And then he announced in a press release that this purchase completed the company's dream of transnational development. So when you have that evidence coupled with... He's meeting Jose Huizar in the context of being introduced to him as this is the gatekeeper for all development in Los Angeles. He holds the keys to the kingdom. And I can't really stress that point enough. Jose Huizar was the single most powerful person. He was the chair of Plum. Yes, he was the chair of Plum. He was also the council member for District 14, which is where this property sat. And there was undisputed testimony, again, even through the defense's witness, Sean Cook, that every council member, every other council member is going to defer to the council district in which the project sits. Can I just... Just out of curiosity, did this thing ever get built? It did not. Okay. It did not get built, Your Honor. Did Huizar ever have any official acts related to the renovations of the LA Grand Hotel? There is nothing that comes directly to mind on that point. I think one of the more extensive things he did that was related to the renovations in some part was the parking dispute, which was the chairman's attempt to get a significant space from an adjacent property. And it related to the way they were trying to redo that hotel. But I wouldn't classify that as an official act. So then let me just back up just a bit. So as you said, there was the evidence about the scheme in Huizar's office. And it was well known that the chairman wanted to build here in LA. Okay. And then after that, he met Huizar? Yes. Well... Or did he meet Huizar beforehand? I'm sorry. I'm not sure I'm understanding the question. Well, when did the chairman know that Huizar was so important? From before he met him. He was sort of introduced... He knew generally... The purpose of meeting was to introduce, here's a developer with property in your district, and here's the council member for that district who also happens to have tremendous influence through PLUM and so forth. That was the context of that first meeting. So then shortly after that, I guess... I don't know how long it was, but when he invites him to go to Las Vegas... That was right on the heels of that initial meeting. Okay. When he does that, he's doing that with the intent to effectuate the quid pro quo. Yes. The elements of bribery were met. He provided the benefit, right? The act is to give, provide, offer the benefit. He's giving the benefit, and he is, as the jury found, rationally intending to get influence for this project that the chairman has in mind that he's going to do. That he's going to do that... How do you relate, quote unquote, the big ask to all of this? So I think the big ask is sort of two part. One part is that this admission that the chairman gave to Ricky Zhang, that I'm doing all this, I'm give, give, giving, because I'm going to have a big ask. That is a direct sort of admission, and it showcases why he took him to Vegas. He has a big ask in mind. And based on all the other evidence, again, with the blueprint and the selection of the property and his portfolio, you know that he already knows what that big ask is going to be. It's going to be the redevelopment for this one person who is the most powerful person for development in Los Angeles. And when was that admission, the give, give, give one? That is something that we don't have a specific time for when the chairman told that to Ricky Zhang. It was made known to Esparza shortly after the March 2015 election, after Jose Huizar kept his seat through, thanks to... After the re-election. Pardon? After the re-election. Yes, after the re-election. And so, and I know the defense is trying to sort of characterize that as some sort of, you know, lobbying statement. And the evidence doesn't come in a vacuum. It's not just this one statement that maybe on its own, divorced from everything else may seem otherwise equivocal. That's not how this worked out. It's in light of all of this conduct, all of this knowledge that the chairman already has, he's telling other employees, Jose Huizar is very important. We need to have his support. What do you think is your best evidence of corrupt intent? I think it's the things I've laid out with respect to the chairman's specific motive, plan, and intent to redevelop. That he immediately upon meeting and learning that Jose Huizar is the one person who can make that happen, taking him to Vegas on the heels of that meeting, followed by all of the concealment conduct that he engaged in to mask those benefits. There is his direct admission, again, of this give, give, give. He has the ask in mind, which then, and then this kind of brings us to the actual execution of the big ask, where he makes an explicit ask for Jose Huizar for this redevelopment. He receives Jose Huizar's agreement. An agreement isn't required, as your honor has noted or observed, but there was an agreement here because Huizar was thrilled to do it. And he in fact responded by telling him, and I can do the motions, I can get the zoning you need for you to build as tall as you want. And then moving forward, the two parties are now executing on that agreement because the chairman continues to provide benefits, the Vegas trips, and now you have Jose Huizar taking action to set that project up for success, including for things like that August 4th, 2016 meeting. So there were benefits given both before and after the agreement. There are, there are. And the fact that the ask came later doesn't mean, it illuminates what this person already had in mind the whole time. And so, you know, all of that is more than sufficient to prove this corrupt intent, especially under the deferential sufficiency of the evidence standard for this case. What about council's evidence-based arguments? I was about to ask Judge Pius if he'd like to. Yeah, the travel act. Council didn't want to address the travel act and how it all relates. You know, I mean, well, I thought it might. I will, I'll briefly address the evidence. No, no, no, I'm happy to talk about the travel act. I had some questions as well. Sure, okay. So with respect to the travel act, the government's position is that the categorical, excuse me, the conduct-based approach applies here. Perrin, Nardello, they all support that you are assessing what was the alleged act and does that satisfy both the generic definition of bribery as contemplated on the travel act, as well as does it constitute a violation of the state statute? So you're not saying, so this was unclear to me, the conduct-based approach is not that if someone commits the crime of bribery in California, that that's enough. No, it is not. Okay, you're saying conduct in relation to some sort of a generic understanding of bribery. Yes, it's still, the conduct still has to satisfy both. It's just that you don't need to do the legal analysis of comparing generic bribery to the statute and whether those are a categorical match such that every single violation of that state statute is also generic bribery. But the conduct still has to satisfy both because the travel act incorporates unlawful activity. That doesn't make any difference that the California statute's a little bit broader. It wouldn't make a difference, although I would say that the California statute is not broader because the generic definition of bribery under the travel act is very broad. I'm not aware of a case where they took that definition and said, this state statute, this state bribery statute doesn't count. Perrin clearly talks about what the purpose of the travel act, which was to increase enforcement, and that's why even commercial bribery is captured. Actually, the Biagi case, it's the second circuit case that the defense did also cite, they even go so far as to say that gratuities under 201 meet the generic definition of bribery for the travel act. So I read Taylor to be a little more narrow than what you're describing for the conduct-based approach. Taylor says, if a jury had to find someone guilty based on those elements that would qualify for bribery under the travel act, that should suffice. So not just whether someone's conduct may have done it, but whether the jury actually made a finding as to those elements. Why isn't that the appropriate standard instead? I, the, Taylor didn't address the travel act as I- No, no, it didn't, but Taylor was citing to Nardello and to Perrin. Sure, and I- In other words, when you're thinking about categorical approaches, and in Taylor, it was about burglary, whether in general, you look at a generic approach of definition of burglary, but there's a narrow exception if you can look beyond just the fact of conviction to see if the jury convicted on elements that would match the generic definition. Right, I guess what I would say about that is, in Chi, there was some suggestion that the court there, which did apply a categorical approach, still looked at what had been charged and still looked at what the jury must have found, which suggests some evaluation of the jury instructions. And then that First Circuit case in Sawyer, they actually did that there as well, because in that case, the travel act predicate was a Massachusetts gratuity statute, which normally wouldn't have an intent to influence, but the parties, for whatever reason, added it in to the jury instructions. And so the court there said, because the jury instructions, you know, has that added intent to influence, they were, it was a satisfactory predicate for the travel act. And with respect to, unless there's other questions on the travel act, I'll address the evidentiary issues. And with respect to the evidentiary issues, as far as the pay to play, as I've sort of alluded to earlier, it was extremely limited. It was provided simply to sort of frame George Esparza's testimony that then went on, consistent with other witnesses, all about this defendant, what he did, how they executed the scheme, how they made it work. And it was all part and parcel with just a sort of overview of how this stuff worked. It's no different than, you know, any other case where you've got a scheme-based conduct to explain, okay, this is how this works. And so, and there was no specific testimony about any of these other schemes or developers or bribes, which is why counsel was referencing the indictment. None of that made it to the jury. But wasn't it a problem for the district court to exclude the testimony about what, how Wang responded to Zhang's statement about, isn't this a problem? Isn't that a mental state exception? No, Your Honor. I believe the cases are clear that that exception is narrow. If it allowed, you know, any hearsay statement by the defense, you know, explaining I'm innocent because X, Y, Z reason, it would obviously not serve its purpose. The key inquiry or the key reason why this doesn't satisfy is because the mental state of mind exception would permit perhaps some sort of testimony that Wei Huang had reacted in a way, basically that he was not concerned. That's the state of mind. He wasn't concerned, but that's not what they wanted to get in. What they wanted to get in was the additional statement that he wasn't concerned because they weren't doing anything wrong, because they were just friends. And in fact, defense counsel at trial sort of did get in later, eventually get in the fact that the inference that he wasn't concerned because after Ricky Zhang raised this to Wei Huang, the next set of questions was, and did he, basically, did he change his behavior? And the answer was no. He continued to do it. And the problem is for, the reason why that was problematic for the defense is because it can go either way. Either it means the chairman wasn't concerned because he, you know, he doesn't care. That's his purpose. He wants to engage in bribery, or he wasn't concerned because he didn't think he was doing anything wrong. It would depend on the substance of the statement, which means it's hearsay, which means it's the reason for the state of mind. And that is a carve, that's carved out from that exception. Can I ask you something? This is an organization, and the sentence was a $4 million fine. Yes, it was. How is that going to be enforced if we uphold this conviction? I don't have an answer for you at this point. The company still exists, so. It's still doing business in California? No, I don't believe it is. I mean, maybe it just exists on paper, but. Who owns the hotel today? No, I don't. Do you know? I don't, I do not know.  So unless there are any other questions, the government would ask this court to affirm the convictions. Okay, thank you, counsel. Thank you. Mr. Brock? You're going to address the Travel Act? I'm going to try to address as much as I can. You don't have to. I would like to, I would like to. Okay, well. I promise I would like to, but I'm going to start with a slightly more high-level point. The government says there's a clear line between goodwill gift and bribery, and they said the difference is whether you have a specific in mind or if it's generalized. That's just not correct legally. The difference between a goodwill gift and a bribe whether it's intended to be bilateral or intended to be unilateral. That's the difference, and I'd urge the court to look at the Al Shuler article that explains this point. It doesn't matter whether he, if he had had 10 hotels and he wasn't sure which, it wouldn't change anything. It has nothing to do with the specificity. It has to do with the intent to enter an agreement. But if there is a clear line between these two things, the jury certainly should have been told where it was, and the jury was not told. The word goodwill gift appears nowhere in the instructions. The word ingratiation appears nowhere in the instructions. The idea about how you're permitted to pay for access under Supreme Court case law, nowhere in the instructions. That was important material that influenced and tainted the jury's ability to make this call. With respect to the Travel Act, Your Honor, this court in Shee applied the categorical approach to a statute that's structured almost exactly the same way. Under the categorical approach, you look at the elements and you compare them to the elements of the generic events. The defining feature of bribery under federal law and generic bribery in 1961 is a quid pro quo. California law does not require a quid pro quo. So under the categorical approach, the California bribery statutes cannot serve as a predicate for Travel Act claims. That's our argument. So the acts here wouldn't qualify? Counsel's arguing about it. They don't look at the acts. Under the categorical approach, you don't look at the acts. You look at the elements. That's what the Supreme Court has said over and over again. What about the Taylor exception where the jury was instructed to convict him? The Taylor instruction is, the Supreme Court explained this in Mathis a few years ago. They said that's where the elements have alternative means in the statute. You know, you could violate it through A or B. And if it's that way, it's really two different offenses. And you can look at the charging documents to see which one. I know that Mathis was getting into whether a statute was divisible or indivisible, but Taylor, at least, just seems to say you can reach it if... We don't need to have that concern that we might otherwise have with the mismatch if you know that the jury convicted based on elements that would apply, such as an official act. I don't think... Mathis is glossing the categorical approach that Taylor created. It's explaining that exception and what it means and doesn't mean, and it's squarely rejected that idea that you can just figure out from looking at the case what the jury actually found. That doesn't matter. You look at the elements. And then very quickly on the evidence, I heard an explanation for why the information about Huizar's other schemes was relevant. I didn't hear anything explaining why it was relevant to the chairman's intent, which is the issue in the case. It isn't because he didn't know any of this, and so it couldn't have been relevant to his intent. We actually asked for a limiting instruction on this at ER 102. It would have said, if you're going to consider these other acts, you only can consider them insofar as they bear on the defendant's intent, and the district court refused to give that. So I don't think there's a good answer to that. And then with respect to the Zhang testimony, first of all, we wanted to get in that he was not concerned. So, which they admitted, I think, is a mental state issue. And as this court explained in Wagner, the only time you can't get into the reason, the underlying reason for the belief, is if you're trying to prove up the truth of that underlying reason. But again, the fact that he said, well, I'm not worried. We're just having a good time. We're not trying to prove that he was having a good time. It's only relevant for the intent. Because I think it, I could, I mean, I think if I had been the trial judge, I might have let it in. But is it an abuse of discretion not to let it in? Well, if it's the question of whether it's hearsay or not hearsay is a legal question, I would say. So first of all, it's an error of law with respect to the hearsay exception. Wagner reversed in a similar situation based on a similar error. And I think it's extremely prejudicial. Actually, government counsel explained why it's so prejudicial. Because without it, all you know is people told him this was not a good idea and he kept doing it. Which, of course, suggests that, you know, he was a scofflaw essentially. He didn't care that he was engaging in bad conduct. We have to fill in, you know, close the loop on that to tell the jury the reason he kept doing it because he didn't think he was doing anything wrong. And of course, they can consider the credibility of that. They can weigh it, but they need to at least have the information to be able to weigh it. Thank you. All right. Thank you, counsel. United States versus Shenzhen, New World One is submitted. And this session of the court is adjourned for today. All rise. This court for this session stands adjourned.
judges: WARDLAW, PAEZ, SANCHEZ